UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| CONCORDIA PARTNERS, LLC,   Plaintiff,  v.  MARCELLE PICK, et al.,   Defendants. | ) ) ) ) ) ) ) ) ) ) ) Docket no. 2:14-cv-009-GZS |

**ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION**

Before the Court are Defendants' Motion for Preliminary Injunction Regarding Licensed Products (ECF No. 90) and Defendants' Motion for Preliminary Injunction Regarding Women to Women Mark (ECF No. 133). As briefly explained herein, both motions are DENIED.

**I.      STANDARD OF REVIEW**

A moving party seeking preliminary injunctive relief under Federal Rule of Civil Procedure 65 bears the burden of persuading the Court that the party has: (1) a likelihood of success on the merits, (2) an irreparable injury in the absence of the requested injunctive relief, (3) that the injury outweighs any harm to the party who would be enjoined, and (4) that the injunction will not harm the public interest. See, e.g., Gonzalez-Droz v. Gonzalez-Colon, 573 F.3d 75, 79 (1st Cir. 2009). Of these four factors, the likelihood of success plays "a pivotal role." Largess v. Supreme Judicial Court, 373 F.3d 219, 224 (1st Cir. 2004); see also Jean v. Mass. State Police, 492 F.3d 24, 27 (1st Cir. 2007) (explaining that likelihood of success on the merits is considered the "most important part of the preliminary injunction assessment").

Likewise, "in most cases, 'irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.'" Gonzalez-Droz v. Gonzalez-Colon, 573 F.3d 75, 79 (1st Cir. 2009) (quoting Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)). Ordinarily, "[e]conomic loss, on its own, is not an irreparable injury so long as the losses can be recovered." DISH Network Serv. L.L.C. v. Laducer, 725 F.3d 877, 882 (8th Cir. 2013). Any such showing of irreparable harm must be "grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II, 370 F.3d at 162. The requirements of likelihood of success and irreparable harm often operate on a sliding scale such that "when the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm...." EEOC v. Astra USA, 94 F.3d 738, 743–744 (1st Cir.1996); see also Ty, Inc. v. Jones Group, Inc., 237 F.3d 891, 895 (7th Cir. 2001) (explaining that the preliminary injunction "process involves engaging in ... the sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position").

In considering all of four factors, the Court remains mindful that a preliminary injunction is "an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). Rather, a district judge should exercise the authority to issue a preliminary injunction "sparingly." Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness of Com. of Mass., 649 F.2d 71, 76 n.7 (1st Cir.1981).

## II.     BACKGROUND[1]

Defendants Marcelle Pick and Pick Enterprises (together, "Pick" or "Defendants") have filed two motions seeking preliminary injunctive relief.[2] Both requests for preliminary injunctive relief arise out of the expiration of the parties October 21, 2006 License Agreement (ECF No. 118-1) (hereinafter "2006 License Agreement"), which was no longer in effect as of October 21, 2013.[3]

### A. Licensed Products

The first motion, filed on January 5, 2015, asks the Court to restrain Plaintiff Concordia Partners, LLC ("Concordia") from selling any Licensed Products, as defined under the parties' now expired 2006 License Agreement. Pick alleges that Concordia has continued to market and sell Licensed Products in violation of the explicit terms of that Agreement. The License Agreement defines "Licensed Products" as follows:

> The following comprise the Licensed Products in this Agreement:
>
> a. Licensed Products as of the Date of this Agreement (also known as "Exhibit A Licensed Products"). These Products are shown in Exhibit A. These Products have been approved by the Owner as acceptable for marketing and sale under this Agreement, including their labeling and quality.

---

[1] The Court assumes familiarity with its prior orders and directs any interested reader to those orders for further background on this litigation. See generally Concordia v. Pick, 2015 WL 1206515 (D. Me. March 17, 2015) (denying motion for contempt); Concordia v. Pick, 2014 WL 4060253 (D. Me. August 14, 2014) (denying motion for remand); Concordia v. Pick, 2013 WL 6817627 (D. Me. Dec. 23, 2013) (denying motion to dismiss); Concordia v. Pick, 2013 WL 5988568 (D. Me. Nov. 12, 2013) (denying motion for temporary restraining order).

[2] The Court notes that the case is already subject to one preliminary injunction that was entered by the state court prior to removal. Defendant Pick filed an interlocutory appeal of that preliminary injunction on February 24, 2014 (ECF No. 32). On June 24, 2015, the First Circuit dismissed this appeal for lack of appellate jurisdiction without reaching the merits. See First Circuit Opinion & Judgment (ECF Nos. 147 & 148).

[3] The parties dispute who is responsible for the termination of the License Agreement and the Court concludes it need not attempt to resolve that factual dispute in connection with the pending motions. See, e.g., Defs. Motion (ECF No. 90) at 7-11; Pl. Response (ECF No. 116) at 5-6.

> b. Product Line Extensions. These Products are shown in Exhibit B. These Products have been approved by both parties for product development, subject to Owner's rights of review and approval in this Agreement. While the timing and priority of development of each such Product is subject to agreement between the parties, it is their expectation to develop most or all of these Products during the Initial Term of this Agreement.
>
> c. New Products. These Products are shown in Exhibit C. These Products will require substantial time and expense for development. While the timing and priority of development of each such Product is subject to agreement between the parties, it is their expectation to develop at least five of these Products during the Initial Term of this Agreement.
>
> d. Third Way Products. From time to time and subject to the remainder of this Subsection d, Concordia, at [Pick]'s request, agrees to develop during the Initial Term and the first Renewal Period, two (2) Third Way Products.  Third Way Product is defined as a product/service program that will require extraordinary time and expense for development that will be attributed to [Pick] and may be but is not required to be sold under the Trademark.  The parties agree that Third Way Products should not be developed at the expense of Product Line Extensions or New Products. Provided development of the Product Line Extensions and New Products is proceeding on a timely basis, and [Pick] elects to invest the time required on her part to develop a Third Way Product, Concordia's development as referred to above shall be an investment of at least $25,000 for the development, testing and marketing of each Third Way Product.

(2006 License Agreement at 26-27.)  The 2006 License Agreement also contains explicit provisions for how to deal with any remaining inventory of Licensed Products after termination of the Agreement; specifically, Section 10 reads:

> Post Termination Rights
>
> A.  Not less than thirty (30) days prior to the expiration of this Agreement or immediately upon termination thereof, Concordia shall provide Owner with a complete schedule of all inventory of Licensed Products then on-hand and for which there is an irrevocable purchase order (the "Inventory"). Concordia agrees to transmit, on a one-time basis and at the expense and request of Owner, a notice to persons who have ordered any Licensed Products within twelve (12) months of the termination of the Agreement. The notice shall provide the name, address, telephone number and email address of Owner.
>
> B.  Upon expiration or termination of this Agreement, except for reason of a breach of Concordia's duty to comply with the quality control requirements, Concordia shall be entitled, for an additional period of six (6) months and on a non-exclusive basis, to continue to sell such inventory.  Such sales shall be made subject to all of

4

> the provisions of this Agreement and to an accounting for and the payment of the Royalty thereon quarterly as otherwise provided herein. Such final accounting and payment shall be due and paid within thirty (30) days after the close of the said six (6) month period.
>
> C.  Upon the expiration or termination of this Agreement, except as otherwise provided in this Agreement, all of the rights of Concordia under this Agreement shall forthwith terminate and immediately revert to Owner and Concordia shall immediately discontinue all use of the Trademark, Domain Name, 800 number for the Clinic, and the sale of all Licensed Products (except in connection with the sale of its inventory as set forth in Sections A and B above), at no cost whatsoever to Owner.
>
> D.  Each party shall have the exclusive right to any copyrighted material, the copyright of which belongs solely to that party, and the joint and equivalent right to use any copyrighted material the copyright of which belongs to the parties jointly hereunder.
>
> E.  Upon termination of this Agreement for any reason, Concordia shall provide notice to Owner if any proposed sale of Inventory in bulk (i.e. not to an individual). Owner shall have the right within ten (10) days after notice from Concordia of such proposed sale to match such offer.

(2006 License Agreement at 18-19 (Section 10).)  Notably, the "Intellectual Property Rights" section of 2006 License Agreement also states in relevant part:

> It is expressly agreed that Concordia has all right, title and interest in the following items developed prior to and after the date of this Agreement: . . . materials regarding Licensed Products . . ., including product names, packaging and marketing methods and Marketing and Packing Materials . . . provided, however, that after termination of the Agreement Concordia may use the foregoing without reference to the Trademark and endorsement of [Pick].

(2006 License Agreement at 16 (Section 8.C).)  Likewise, the 2006 License Agreement explicitly contemplates that Concordia could "offer products without the Trademark to customers of Licensed Products so long as it does not do so through the [womentowomen.com] website or by other means that state, implies or suggests endorsement by [Pick]."  (Id. at 7 (Section 1.G).)

Pick's Motion for Preliminary Injunction specifically seeks to enjoin the sale of fourteen products.  (See Pick Aff. Ex. A (ECF No. 91-1).)  One of those fourteen products, Essential

5

Nutrients, is an "Exhibit A Licensed Product" that was already being sold prior to the 2006 License Agreement. (Id.) Three of the fourteen products (Herbal Equilibrium, PMS Solution, and The Basics) are "Exhibit B Product Line Extensions." (Id.) The other nine products at issue fall under the umbrella of "New Product Development." (Id.) All fourteen products are being sold by Concordia with product names that are the same or very similar to the names used prior to 2014 and apparently the same formulations. What Concordia has changed is the brand: the products are now sold under the brand "Women's Health Network" (WHN), not the "Women to Women" mark that Pick retained after October 21, 2013.

By continuing to sell the fourteen products via its new website without reference to the Women to Women trademark or any Pick endorsement, Concordia asserts that its ongoing sales do not breach the terms of the 2006 License Agreement. Pick, however, insists that a reasonable construction of the 2006 License Agreement shows that Pick owns the "Licensed Products." Pick additionally asserts that many, if not all, of the products at issue were developed using "confidential information" provided by Pick. Under Section 15 of the 2006 License Agreement, Concordia agreed that during the term of the Agreement "and thereafter Concordia will not use confidential information disclosed to it by [Pick] for any purposes except as permitted under this Agreement." (2006 License Agreement at 22 (Section 15.B).) "Confidential information" is further defined in the same section of the Agreement, as follows:

> [A]ll information provided to Concordia by MP with respect to MP's proprietary medical therapies and women's health, including but not limited to information regarding chronic fatigue syndrome and breast cancer, shall be deemed confidential unless already generally known other than as a result of a breach of this Agreement by Concordia.

(Id.)[4]  In short, the likelihood of Pick's success on the contract claims related to Licensed Products turns on the construction of all of the just-discussed terms of the 2006 License Agreement.

### B. The "Women to Women" Trademark

The second motion for preliminary injunction, filed in March 2015, asks the Court to restrain Concordia from using the "Women to Women" mark.  There is no dispute that the "Women to Women" mark is registered to Pick and upon termination of the 2006 License Agreement in October 2013, Concordia lost any license it had to use the "Women to Women" trademark, including the associated domain name.  In connection with the pending motion and as required by the terms of the 2006 License Agreement, Concordia acknowledges that the "Women to Women" mark is entitled to trademark protection.  (See Pl. Response (ECF No. 138) at 15.)  However, Concordia disputes that it is engaged in any conduct that constitutes infringement of this trademark.

Although Concordia has in the past had positive customer reviews on its WHN website that reference the Women to Women mark, currently the only publication of the "Women to Women" mark by Concordia on its WHN website consists of a disclaimer letting website visitors know that "our relationship with Women to Women has ended — we're now Women's Health Network.  Very new!" (Bilodeau Decl. (ECF No. 138-10) ¶¶5, 11-13 & Ex. A (ECF No. 138-11).)  Concordia made a similar use of the Women to Women mark when it announced its launch of the Women's Health Network website in October 2013.  (See Pick Decl. (ECF No.

---

[4] Although the record provides much additional disputed information regarding the communication between Pick and Concordia related to the development and approval of specific products, the Court finds this factual information to be irrelevant to the resolution of the pending motion.  See, e.g., Defs. Reply (ECF No. 121) (asserting that "statements . . . relating to Marcelle Pick's involvement and contribution to the development of the products is not relevant to the ownership of the Licensed Products.")  Therefore, the Court leaves resolution to these product-specific factual disputes for trial on a more fully developed record.

7

133-1) ¶18 & Ex. K (ECF No. 133-1 at Page ID# 2637).)  Besides these past uses, the record before the Court provides evidence of only one other ongoing use of the "Women to Women" mark by Concordia:  the purchase of search engine keyword ads on Yahoo and Google.  (See Pick Decl. (ECF No. 133-1) ¶21 & Ex. M.)  The result of these purchases is that ads for "Women's Health Network" appear when a user types "women to women" into a search engine operated by Google or Yahoo.

Via the Declaration of Jessica Olmstead, a Customer Service Advisor for Pick Enterprises, Pick provided evidence of 69 phone calls received between December 29, 2014 and March 12, 2015 that evince confusion by customers between Women to Women and the Women's Health Network.  (See Olmstead Decl. Ex. B (ECF No. 133-2).)  Additionally, Olmstead provides the Court an additional thirteen emails from customers that evince some confusion between Women to Women and WHN.  (See Olmstead Decl. Exs. C-M (ECF No. 133-2).)

### III. DISCUSSION

With this factual background laid out the Court proceeds to consider whether the record supports the preliminary injunctive relief requested by Pick; that is, the enjoining of Concordia's product sales or the enjoining of Concordia's purchase of "Women to Women" keyword ads.

#### A. Licensed Products

##### 1. Likelihood of Success

On the record presently before the Court, there is a genuine, trialworthy issue regarding whether Concordia's continued sale of any of the fourteen specified products under the "Women's Health Network" trademark constitutes the sale of "Licensed Products" under the

terms of the 2006 License Agreement. Therefore, the Court cannot describe Pick's likelihood of success as anything other than a possibility. Rather, the Court concludes the likelihood of success factor weighs in favor of allowing the status quo to continue until this dispute is resolved on a fully developed record.

For purpose of the present motion seeking to enjoin the sale of the fourteen specified products, even if the Court were to assume that Pick will prevail and that the terms of the License Agreement and the preponderance of the evidence will show that Concordia is in fact continuing to sell "Licensed Products," it is not clear that Pick's available remedies include blocking further sales of these Licensed Products. Rather, such a determination would apparently entitle Pick to royalty payments under the following provision of the 2006 License Agreement:

> Concordia's obligations for the payment of a Royalty shall survive expiration or termination of this Agreement and will continue for so long as Concordia continues to manufacture, procure, sell or otherwise market the Licensed Products.

(2006 License Agreement at 10 (Section I.3).) Whether other terms of the License Agreement would require Concordia to stop selling all or some of the fourteen products at issue would require a product-by-product determination of the use of confidential information and would inevitably require the fact finder to determine for each product what changes might bring the product outside the "Licensed Products" umbrella. In short, the Court concludes Pick has not met the burden of proving the requisite likelihood of success to block Concordia from further sales of the fourteen products at issue. Even if the likelihood of success factor weighed in favor of the requested injunction, for reasons that follow, the Court would deny the requested injunctive relief based on its assessment of the other factors.

### 2. Irreparable Harm

As Pick appropriately acknowledges in her Motion, "[n]ormally irreparable harm does not exist if an award of damages at the end of trial would be adequate to make the plaintiff whole." (Defs. Motion (ECF No. 90) at 15.) Indeed, the First Circuit has long held that "an entitlement to money damages, without more, rarely constitutes an adequate basis for injunctive relief." CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 622 (1st Cir. 1995). Ultimately, the Court concludes that Pick, as the movant, has not met the requisite burden of showing that denial of the requested injunction is likely to cause *irreparable* harm. See Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) (holding that "irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief").

The Court acknowledges that both sides are apparently experiencing financial harm as a result of this ongoing litigation. For its part, Defendants describes themselves as "in substantial financial distress and not current on many obligations, including attorneys' fees in this particular litigation with Concordia." (Poulin Decl. (ECF No. 92) ¶11.) Likewise, Plaintiff explains that it "has laid off many employees, closed product lines and diversification efforts, reduced expenses and foregone needed maintenance in order to afford its legal fees." (McKinnon Decl. (ECF No. 118) ¶27.) These financial harms reflect apparent strategic decisions by both parties to litigate this dispute in a manner that maximizes the costs for both sides; this type of litigation-induced financial harm rarely, if ever, rises to the level of irreparable harm warranting enjoining the status quo operation of a business.

Additionally, the Court notes that Pick began selling competing products through her own Women to Women website in late February 2014. (See Poulin Decl. (ECF No. 92) ¶5.)

However, she did not request injunctive relief on the sale of Licensed Products until December 2014. Such delay further "detracts from the movant's claim of irreparable harm." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004) ("The longer the delay, the more pervasive the doubt.")

Ultimately, the current record does not provide the requisite showing that the financial harm cannot be resolved via a later award of money damages and the Court finds no irreparable harm can be tied to Concordia's ongoing sale of the fourteen products.[5]

### 3. Balance of Harms & Public Interest

Beyond not finding the requisite proof of irreparable harm in the absence of the requested injunction, the Court also concludes that the balance of the harms weighs against entry of the injunction. Concordia says an injunction that required them to stop selling the fourteen specified products would impact "95 percent of Concordia's sales revenue" and thereby create a harm for Concordia that would be "immediate and devastating" and "would end Concordia's business." (McKinnon Decl. (ECF No. 118) ¶25.) Moreover, the Court cannot say that the public interest would be served by enjoining Concordia from selling these fourteen nutritional supplements while this litigation remains pending; this is particularly true when there is a possibility that Concordia will prevail and be allowed to continues to sell one or more of the specified products after entry of final judgment.

The Court concludes that none of the four factors ultimately weigh in favor of enjoining Concordia's sale of the fourteen "Licensed Products" and therefore DENIES this Motion for Preliminary Injunction (ECF No. 90).

---

[5] In fact, it appears that entry of the requested preliminary injunction regarding the "Licensed Products" may leave Concordia with less resources to satisfy any later judgment.

### B.     "Women to Women" Trademark

#### 1.     Likelihood of Success

A trademark holder's claim over its mark extends to uses of the mark "likely to cause confusion, or to cause mistake, or to deceive."[6] 15 U.S.C. § 1114(1)(a). Because there is no genuine dispute that Pick is entitled to protection for the "Women to Women" mark, Pick's likelihood of success on any trademark claims turns on the proof of likelihood of confusion. The First Circuit has "interpreted 'likely confusion' to mean 'more than the theoretical possibility of confusion.' In other words, the allegedly infringing conduct must create 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care.'" Boston Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 12 (1st Cir. 2008) (quoting Int'l Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr., 103 F.3d 196, 200-01 (1st Cir.1996)). In the First Circuit, the likelihood of confusion generally is determined by consideration of the Pignons factors:

> (1) the similarity of the marks; (2) the similarity of the goods (or, in a service mark case, the services); (3) the relationship between the parties' channels of trade; (4) the juxtaposition of their advertising; (5) the classes of prospective purchasers; (6) the evidence of actual confusion; (7) the defendant's intent in adopting its allegedly infringing mark; and (8) the strength of the plaintiff's mark.

Dorpan, S.L. v. Hotel Melia, Inc., 728 F.3d 55, 65 (1st Cir. 2013) (*citing* Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir.1981)).

---

[6] The courts that have had the opportunity to address the question had held that "use" of a mark includes the purchase of ads tied to a trademarked keyword. See, e.g., Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1145 (9th Cir. 2011) ("We now agree with the Second Circuit that [the purchase of trademark as a search engine keyword] is a 'use in commerce' under the Lanham Act."); Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir. 2009) (selling plaintiff's mark as a search term to trigger the competitors' sponsored links was "use in commerce" within the meaning of the Lanham Act); Hearts on Fire Co., LLC v. Blue Nile, Inc., 603 F.Supp.2d 274, 283 (D. Mass. 2009) ("[T]here is little question that the purchase of a trademarked keyword to trigger sponsored links constitutes a 'use' within the meaning of the Lanham Act.").

In the Court's assessment, many of these factors weigh in favor of finding a likelihood of confusion, including (1) there is very significant similarity goods, as already discussed in connection with the "Licensed Products" dispute; (2) the parties have a similar on-line channel of trade and the same audience of purchasers, (3) Concordia's use of the "women to women" keyword ad is clearly intended to place its website in front of customers searching for the "women to women" website; and (4) there is some evidence of actual confusion.

However, most of the evidence of actual confusion is not necessarily tied to the keyword ads. Rather, it appears that much of the actual confusion is a result of the prior relationship between the parties, which has resulted in very similar product lines as well as the similarities in website content. Additionally, the Court notes that Pick's failure to bring forward evidence regarding her total sales and total number of customers for the period in question makes it hard to assess the full impact of the anecdotal evidence of confusion contained in the record.

In assessing the confusion caused by the deliberate purchase of search engine ads tied to a trademarked keywords, at least one district court in Massachusetts has suggested that:

> [T]he likelihood of confusion will ultimately turn on what the consumer saw on the screen and reasonably believed, given the context. This content and context includes: (1) the overall mechanics of web-browsing and internet navigation, in which a consumer can easily reverse course; (2) the mechanics of the specific consumer search at issue; (3) the content of the search results webpage that was displayed, including the content of the sponsored link itself; (4) downstream content on the Defendant's linked website likely to compound any confusion; (5) the web-savvy and sophistication of the Plaintiff's potential customers; (6) the specific context of a consumer who has deliberately searched for trademarked diamonds only to find a sponsored link to a diamond retailer; and, in light of the foregoing factors, (7) the duration of any resulting confusion.

Hearts on Fire Co., LLC v. Blue Nile, Inc., 603 F. Supp. 2d 274, 289 (D. Mass. 2009). The current record before this Court does not allow for a thorough consideration of these nuanced factors. The lack of evidence on these points and lack of evidence tying the keyword ads and the actual confusion evidence raises questions regarding Pick's likelihood of success.

Moreover, Hearts on Fire serves as just one example of how trademark infringement based on keyword ads is an area of trademark law that is "under construction." See also Alzheimer's Foundation of America v. Alzheimer's Disease and Related Disorders Assoc., 10 Civ. 3314 (RWS), slip op. at 13-39 (S.D.N.Y. June 29, 2015) (denying a preliminary injunction to block the purchase of search engine ads ties to trademarked keywords). Within this developing area of law, this case presents a unique set of facts given the parties previous partnership in developing the "Women to Women" mark and the language of the License Agreement, which apparently did not contemplate the unraveling that has occurred.

Given the totality of the current record and available precedent, the Court can only conclude that Pick has some likelihood of success on trademark infringement claims based on the ongoing keyword ads.[7]

### 2. Irreparable Harm

While the First Circuit at one time endorsed the view that "a trademark plaintiff seeking a preliminary injunction who demonstrates likely confusion creates a presumption of irreparable harm," Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc., 704 F.3d 44, 53 (1st Cir. 2013), the Circuit has recognized that such a presumption may no longer be allowed under eBay v. MercExchange, LLC, 547 U.S. 388, 393-94 (2006). See Swarovski, 704 F.3d at 53. In the absence of any presumption and on the record before the Court, the Court declines to find that Pick will experience irreparable harm to her mark if Concordia is allowed to continue to buy ads using the "women to women" keywords. Currently, any customer who searches for

---

[7] Although both parties provide analysis under the "initial interest confusion" doctrine, the Court declines to engage in any "initial interest confusion" analysis because the First Circuit has yet to adopt this concept. See, e.g., Hearts on Fire Co., LLC v. Blue Nile, Inc., 603 F. Supp. 2d 274, 283 (D. Mass. 2009) (noting that initial interest confusion "not been fully explored or addressed by the First Circuit").

"women to women" in Google or Yahoo apparently sees Pick's website link in addition to the WHN ad, which is designated as an "ad" by both search engines. (See Pick Decl. Ex. M (ECF No. 133-1 at Page ID# 2647-28).) Assuming the potential customer chooses to click on the WHN ad, upon investigation at the WHN website, the potential customer would see the disclaimer that "our relationship with Women to Women has ended — we're now Women's Health Network." (Bilodeau Decl. Ex. A (ECF No. 138-11).) A reasonably prudent customer who only wishes to buy from Women to Women would likely turn back at this point and reexamine the search results. The Court's conclusion that irreparable harm is lacking is further bolstered by Pick's decision to delay requesting injunctive relief until March 2015, seventeen months after Concordia lost its license to use the Women to Women mark.[8]

### 3. Balance of the Harms & Public Interest

In the Court's final assessment, the balance of the harms does not clearly favor the issuance of the requested injunction. However, the Court also finds that the issuance of the requested trademark injunction would not cause grave harm to Concordia. Thus, the balance of harms favors neither side. Likewise, given the limited evidence that the requested injunction would actually address the anecdotal reports of actual customer confusion, the Court sees no public benefit to the issuance or denial of the requested injunction.

While Pick comes closer to meeting the standard for issuance of a requested injunction regarding the "Women to Women" mark, the Court ultimately finds some grounds for questioning her likelihood of success and a lack of irreparable harm. Additionally, the other

---

[8] Additionally, the record clearly shows that Pick was aware of these allegedly infringing keyword ad buys in December 2013. See Stitham Decl. Ex. B (ECF No. 138-3) at Page ID# 2745. The Court also acknowledges that the discovery deadline in this litigation is now set for the end of this month, which means that this case could readily be resolved on the merits before the end of 2015.

two factors do not weigh in favor of issuance of an order enjoining Concordia's current limited ongoing use of the "Women to Women" trademark.

## IV.   CONCLUSION

Having weighed the required factors in light of the record now before the Court, Defendants' Motions for Preliminary Injunctions (ECF Nos. 90 & 133) are hereby DENIED.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 2nd day of July, 2015.